******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# VOGUE *v.* ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT
## (AC 42845)

Bright, C. J., and Cradle and Suarez, Js.

*Syllabus*

The plaintiff appealed to the trial court from the decision of the Employment Security Board of Review affirming the decision of an appeals referee of the Employment Security Appeals Division that the plaintiff was liable for certain unpaid unemployment compensation contributions under the Unemployment Compensation Act (§ 31-222 et seq.). The plaintiff sold jewelry and provided body piercing and tattoo services in its store at a shopping mall. The plaintiff and S, a tattoo artist, entered into an agreement under which the plaintiff would receive one half of S's fees for tattoo services that S would sell from a room in the plaintiff's store. An audit by the defendant Administrator of the Unemployment Compensation Act thereafter determined that S was an employee of the plaintiff, rather than an independent contractor, as the plaintiff had claimed. The appeals referee found, inter alia, that S did not pay rent to the plaintiff for the room, that S performed tattoo services only during store hours, and that the plaintiff advertised on its website and Facebook page that customers could have tattoos done at its store. The board determined that the plaintiff failed to satisfy any of the three requirements of the ABC test, as set forth in § 31-222 (a) (1) (B) (ii) (I), (II) and (III), which governs the determination of whether services performed by an individual constitute employment under the act. On appeal from the appeals referee's decision that affirmed the defendant's determination, the board reasoned that, under part B of the ABC test in § 31-222 (a) (1) (B) (ii) (II), S's tattoo services were not performed outside of the plaintiff's usual course of the business or outside of the place of its business, and that S's tattoo services were an integral part of the plaintiff's business enterprise. After the plaintiff appealed to the trial court, the board denied in part a motion the plaintiff filed to correct certain of the appeals referee's findings of fact. The defendant then filed a motion for judgment in which it asserted that the plaintiff had failed to prove that S was not an employee pursuant to the act. The court agreed with the board that the plaintiff failed to satisfy part B of the ABC test, and granted the defendant's motion and rendered judgment dismissing the plaintiff's appeal. The court rejected the plaintiff's claim that the board's findings were improper and concluded that the board properly determined that the plaintiff failed to satisfy part B of the ABC test. *Held* that the trial court properly dismissed the plaintiff's appeal, as the board and the court properly applied part B of the ABC test in § 31-222 (a) (1) (B) (ii) (II) to the plaintiff's employment relationship with S: the record contained substantial evidence for the court and the board to have determined that S's provision of tattoo services was within the plaintiff's usual course of business and a regular part of its business enterprise, the board's conclusion that S's services were an integral part of the plaintiff's business and that tattoo customers were part of its customer base was strongly supported by the board's findings that the plaintiff, at no cost to S, provided S with a workspace and permitted him to use its credit card machine to collect payments, and the plaintiff's advertisements reflected that the plaintiff portrayed itself to the public as a seller of tattoo services that were offered during the hours in which the plaintiff's store was open for business; moreover, the only income S earned was derived from the tattoo services he provided in the plaintiff's store, the plaintiff required tattoo customers to sign a waiver of liability as to the plaintiff and S, and, contrary to the plaintiff's claim that the board and the court focused solely on the plaintiff's advertisements and not on other findings that did not support the board's determination, the board and the court indicated that their decisions were made after a review of the entire record.

Argued September 16, 2020—officially released January 19, 2021

*Procedural History*

Appeal from the decision of the Employment Security Board of Review affirming the decision of an appeals referee of the Employment Security Appeals Division that the plaintiff was liable for certain unpaid unemployment compensation contributions, brought to the Superior Court in the judicial district of New London; thereafter, the Employment Security Board of Review denied in part the plaintiff's motion to correct; subsequently, the plaintiff filed an amended appeal with the trial court; thereafter, the court, *S. Murphy, J.*, affirmed the Employment Security Board of Review's denial in part of the plaintiff's motion to correct, granted the defendant's motion to dismiss and rendered judgment dismissing the appeal, from which the plaintiff appealed to this court. *Affirmed.*

*Santa Mendoza*, for the appellant (plaintiff).

*Krista D. O'Brien*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Philip M. Schulz*, assistant attorney general, for the appellee (defendant).

*Opinion*

SUAREZ, J. The plaintiff, Vogue, appeals from the judgment of the trial court, rendered in favor of the defendant, the Administrator of the Unemployment Compensation Act, dismissing the plaintiff's appeal from the decision of the Board of Review of the Employment Security Appeals Division (board).[1] The board had affirmed the decision of an appeals referee of the Employment Security Appeals Division (appeals division), who had affirmed the decision made by the defendant, following an audit of the plaintiff, that the plaintiff was liable for unpaid unemployment compensation contributions under the Unemployment Compensation Act (act), General Statutes § 31-222 et seq., with respect to one of its employees. The primary issue in this appeal is whether the court improperly interpreted and applied part B of the so-called "ABC test" of the act, which governs whether an employment relationship exists for purposes of the act.[2] We affirm the judgment of the trial court.

The following undisputed facts and procedural history underlie the present appeal. The plaintiff leases retail space in an indoor shopping mall in Waterford. It sells, among other things, body jewelry and body piercing services. In 2013, the plaintiff entered into an agreement with an individual, Mark Sapia, whereby, in exchange for a portion of Sapia's profits, Sapia would sell tattoo services from the rear portion of the plaintiff's store. On March 11, 2016, after one of the defendant's field officers conducted an audit of the plaintiff's business for 2014 and 2015, the defendant concluded that Sapia was an employee of the plaintiff, not an independent contractor as the plaintiff had maintained. Consequently, the defendant reclassified payments made to Sapia in 2014 and 2015 by the plaintiff as wages, and, with respect to those wages, the plaintiff was liable for the payment of contributions required under the act. The defendant, however, did not conclude that the plaintiff wilfully had failed to report Sapia as an employee.

In March, 2016, the plaintiff appealed from the defendant's decision to the appeals division. On August 15, 2016, an appeals referee conducted an evidentiary hearing. In a memorandum of decision dated September 2, 2016, the appeals referee set forth several findings of fact. After discussing relevant legal principles, the appeals referee concluded that the defendant properly had determined that Sapia was an employee of the plaintiff, not an independent contractor. Thus, the appeals referee affirmed the defendant's decision and dismissed the plaintiff's appeal.

The appeals referee's findings were as follows: "(1) [Sapia] worked as a tattoo artist at [the plaintiff's store] from approximately 2013 through the time of the audit.

Sapia himself personally performs the tattoo services for the customers at [the plaintiff's store]. The owner of [the plaintiff] classified Sapia as an independent contractor when the company was [completing] a registration form with the [defendant].

"(2) Based on that information, the [defendant] conducted an audit of [the plaintiff] and checked its payroll records and the status of individuals working for that company. [The plaintiff] had four employees working for the company, not including the owner or [Sapia].

"(3) When Sapia began working for [the plaintiff], the parties agreed that when [Sapia] tattooed the customer, Sapia would get 50 percent of the sales price and the owner would get the other 50 percent. Sapia was allowed to use the credit card machine for [the plaintiff's store] when selling his tattoo services. Sapia did not have to pay to use that credit card machine. The owner would then give Sapia his percent[age] of the credit card sales once those transactions were approved by the credit card company. [The plaintiff] had a back room in the store where Sapia was to perform his tattoo work on the customers. The price of the tattoo was determined by Sapia.

"(4) The owner also had Sapia sign an agreement when they started working together, which indicated that Sapia was an independent contractor, outlined the payment arrangements, and allowed the owner to review or check the work performed by Sapia. That agreement also stated that [Sapia] was responsible for correcting any mistakes with the tattoos and that [the plaintiff] could deduct moneys from Sapia if a customer complaint was not resolved.

"(5) Although the agreement also required that Sapia carry his own business liability insurance, Sapia did not do so, which the owner knew.

"(6) The owner provided Sapia with a sterile environment at the store where [the plaintiff] is located for him to perform his tattoo services for the general public. Sapia is registered with the state of Connecticut as a tattoo technician, and when he is placing the tattoos on the customers, he must do so in a sterile environment.

"(7) Sapia did provide his own ink and needles in order to place the tattoos on the customers he serviced at [the plaintiff's store]. Sapia also used his own laptop for his work.

"(8) [The plaintiff] keeps track of all of the tattoo sales made by Sapia when he is working in the store. When a customer paid for the tattoo in cash, then Sapia would keep 50 percent of the sale for himself and turn over the other 50 percent to the owner. The owner did not pay any other moneys to Sapia in 2014 and 2015. Sapia only performed his tattoo services during the store hours established by [the plaintiff] because the owner did not issue a store key to Sapia, who could

not access the store on his own.

"(9) When Sapia sold a tattoo and applied the tattoo on the customer, the customer received a receipt, which listed the business name of the [plaintiff] company, Vogue, as well as the phone number, address and website for [the plaintiff company] Vogue. The [plaintiff's] owner also required that Sapia have the customers sign a waiver/release form, which was an agreement between [the plaintiff] and the customer, to release both [the plaintiff] and Sapia from various types of liability.

"(10) [The plaintiff] is in the business of providing piercings, selling jewelry for the piercing, and offering tattoo services. [The plaintiff] advertises through its website and its Facebook page that a customer can have piercings or tattoos done at its store and lists the hours that the tattoo artist is in the store.

"(11) [The plaintiff] provides a back room in the store where Sapia is able to perform his tattoo services for the customers of [the plaintiff]. [The plaintiff] also provides a table, chairs, and cleaning supplies for that room.

"(12) Sapia does not have to submit an invoice to [the plaintiff] in order to be paid his 50 percent of the tattoo services that he provides to the customers at [the plaintiff's store]. Sapia does not pay any rent to [the plaintiff] to use the employer's sterile room to perform his services, and all advertisements are done by [the plaintiff], other than [Sapia] mentioning his tattoo services on his social media sites, which also include the contact information at [the plaintiff's store].

"(13) The [plaintiff's] owner was not aware of any insurance or other paperwork to show that Sapia had established his own business or that he had his own company [that] offered tattoo services to the general public.

"(14) When the field auditor [for the defendant] conducted the audit, the only income reported by Sapia was the moneys that he received from [the plaintiff]."

In September, 2016, the plaintiff appealed from the decision of the appeals referee to the board. In a memorandum of decision dated January 19, 2017, the board expressly adopted the findings of fact of the appeals referee without modification, with the exception of the tenth finding of fact, to which the board added the following finding: "Sapia is the only tattoo artist performing tattoo services for the [plaintiff]."

Like the appeals referee, the board stated that its analysis of whether Sapia was an employee for purposes of the act was governed by the ABC test that is codified at General Statutes § 31-222 (a) (1) (B) (ii) (I), (II) and (III), with parts A, B, and C of the test corresponding to clauses (I), (II) and (III), respectively, of the statute. Section 31-222 (a) (1) (B) (ii) defines " '[e]mployment' "

in relevant part as any service performed by "any individual who, under either common law rules applicable in determining the employer-employee relationship or under the provisions of this subsection, has the status of an employee. Service performed by an individual shall be deemed to be employment subject to this chapter irrespective of whether the common law relationship of master and servant exists, unless and until it is shown to the satisfaction of the administrator that (I) such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; and (II) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and (III) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed . . . ." In light of the fact that the ABC test is written in the conjunctive, "unless the party claiming the exception to the rule that service is employment shows that all three prongs of the test have been met, an employment relationship will be found." *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, 265 Conn. 413, 419, 828 A.2d 609 (2003).

The board addressed whether the plaintiff, which claimed that the services provided by Sapia did not constitute employment for purposes of the act, had satisfied its burden of demonstrating that all three prongs of the test were satisfied. The board determined that the plaintiff had failed to satisfy all three prongs of the ABC test. We focus on the board's analysis under part B because that portion of the board's analysis is dispositive of the plaintiff's claim on appeal. As set forth previously, pursuant to part B, service is deemed to be employment unless and until it is shown that "such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed . . . ." General Statutes § 31-222 (a) (1) (B) (ii) (II).[3]

With respect to part B of the test, the board concluded that Sapia's service was not performed outside of the plaintiff's usual course of the business or the place of its business. The board stated: "In the case before us, the [plaintiff] describes itself on its website as 'your one stop destination for body jewelry, stainless steel jewelry, as well as piercing and tattoo services.' The [plaintiff's] website also advertised that it provided tattoo services during all open store hours. While we recognize that Sapia was the only tattoo artist performing these services on the employer's behalf, both the [plaintiff's] website and Facebook page describe the company as 'Vogue Tattoo and Piercings.' Therefore, we find that

the services that Sapia provided were integral to the employer's business and were not outside its usual course of business. Sapia also provided his services at the [plaintiff's] store and, thus, not 'outside [of] all [the] places of business' for [the plaintiff]."

Accordingly, the board determined that Sapia was employed by the plaintiff for purposes of the act and that the plaintiff was liable for any contributions related to his wages that were required by the act. The board affirmed the decision of the appeals referee and dismissed the plaintiff's appeal.

In February, 2017, the plaintiff appealed from the decision of the board to the trial court in accordance with General Statutes § 31-249b[4] and Practice Book § 22-1 et seq. In its appeal, the plaintiff asserted that several of the board's findings were not supported by the evidence and that the board had misapplied relevant legal principles to the facts of the case. In January, 2018, the plaintiff, pursuant to Practice Book § 22-4,[5] filed with the board a motion to correct fourteen of its findings. In April, 2018, the board issued a memorandum of decision in which it granted, in part, and denied, in part, the motion to correct. Before we discuss the corrected findings, we observe that, to the extent that it granted the motion, however, the board determined that its modified findings did not alter its conclusion that Sapia was an employee of the plaintiff.

The board granted the plaintiff's request that it correct finding thirteen to state: "Sapia advertised his services to the general public through social media, including his Instagram, Etsy, Facebook, and e-mail. He also had business cards that advertised his services." The board stated that this correction did not affect its analysis with respect to part C of the ABC test.

The board granted the plaintiff's request that it correct finding twelve to reflect that, "in addition to [the plaintiff's] advertising on its website, Sapia also advertised his own services through social media . . . ." The board stated that this alteration of its finding did not affect its analysis with respect to part C of the ABC test.

The board granted the plaintiff's request that it add the following language to finding eight: "The [plaintiff's] store hours are limited by the mall's hours of operation, and Sapia is free to perform his tattoo services anywhere or at any time." The board stated that this correction did not affect its conclusion with respect to part C of the ABC test because "the [plaintiff] was unable to provide other specific details regarding the tattoo work that Sapia performed and received compensation to perform."

The board granted the plaintiff's request that it modify its decision to add the following finding: "The [plaintiff] set aside a designated workspace in its store. Sapia's workspace was required to be clean and have no rug."

The board stated: "In the case before us, regardless of the type of flooring required by the health department, it is undisputed that Sapia performed his work at the [plaintiff's] retail establishment. Thus, he performed services at the [plaintiff's] place of business, and this proposed finding would not alter our conclusion with regard to part B of the ABC test."

The board granted the plaintiff's request to correct its decision with respect to Sapia's activities in the plaintiff's store, stating: "The [plaintiff] permitted Sapia to create, sell, and display his artwork in the space and to keep 100 percent of the proceeds that any person would pay for his art." The board, in concluding that this alteration of its findings did not affect its analysis under the ABC test, stated in relevant part: "The [plaintiff] did not provide proof establishing that Sapia, in fact, sold any pieces of art while he was working in the [plaintiff's] store. However, [the plaintiff's owner] testified that Sapia creates, displays, and is free to sell his artwork in the [plaintiff's] store. . . . Nonetheless, this corrected finding addresses just one factor that is weighed in the balancing test for part A, and, thus, the [plaintiff] has not shown that this correction would alter the ultimate outcome in this case." (Citation omitted.)

The board granted the plaintiff's request that it modify finding seven to include the following language: "Sapia owns all of his own intellectual property and stores this property on his personal laptop." The board stated that this alteration did not alter its conclusion under part C of the ABC test.

The board granted the plaintiff's request that it modify a portion of the transcript of the hearing before the appeals referee by adding the following finding: "Sapia has the right to find a substitute to come in and perform tattoo services." The board explained that this finding did not alter its conclusion under part A of the ABC test because Sapia's right to obtain a substitute was just one of many factors it may consider in its evaluation of the facts. In sum, despite amending some of its factual findings, the board maintained its conclusion that the plaintiff failed to satisfy all three parts of the ABC test.[6]

In May, 2018, after the board issued its decision with respect to the plaintiff's motion to correct, the plaintiff filed an amended appeal in the trial court. As it did in its original appeal, the plaintiff argued that the board had based its decision on erroneous findings and that it misapplied the law to the facts of the case. The plaintiff challenged the board's determination that Sapia was an employee under parts A, B, and C of the ABC test. The amended appeal included claims of error related to the board's decision on the plaintiff's motion to correct.[7] Thereafter, the defendant filed a motion for judgment in his favor and an accompanying memorandum of law. Essentially, the defendant argued therein that the plaintiff had failed to prove that Sapia was not an employee

for purposes of the act and that the board had correctly applied the law to the facts of the case. The plaintiff filed an objection to the motion for judgment.

In January, 2019, the court heard argument on the defendant's motion for judgment and the plaintiff's objection thereto. Thereafter, on April 4, 2019, the court rendered judgment dismissing the appeal. In its memorandum of decision, the court first addressed the merits of that portion of the plaintiff's amended appeal in which the plaintiff claimed that the board erred by denying five of the requests set forth in its motion to correct. After it rejected the plaintiff's claim that the board's findings were improper and that a remand to the board for a new hearing was necessary, the court addressed the claim that the board improperly had interpreted and applied the ABC test.

The court focused its analysis on part B of the test, stating in relevant part: "The plaintiff . . . challenges the board's determination that the plaintiff failed to meet part B of the ABC test because it failed to establish that Sapia performed his services outside the usual course of business. The plaintiff argues that tattoo services are not a continuous business with respect to the plaintiff because [tattoo services are only performed] when Sapia is physically present. The defendant argues that the plaintiff's focus on Sapia's availability ignores the definition of usual course of business . . . .

"Part B of the test is stated in the disjunctive. Thus, the plaintiff bears the burden of establishing either that the services were outside the usual course of its business or that the services were performed outside of its place of business. The plaintiff need only prove one of the two in order to satisfy part B of the test. A review of the pleadings reveals that the plaintiff does not challenge the board's finding that the tattoo services provided by Sapia were [not] outside of its place of business. Therefore, the court will only address the plaintiff's argument that Sapia performed his services outside the usual course of [its] business."[8]

After setting forth relevant authority concerning part B of the ABC test, the court stated: "In the present case, the findings of fact made by the referee and adopted by the board make it clear that the board did not act unreasonably or arbitrarily in concluding that the provision of tattoo services was within the plaintiff's usual course of business. Substantial evidence exists in the record for the board to have determined that the provision of tattoo services was within the plaintiff's usual course of business. The plaintiff's business has offered tattoo services on a regular and continuous basis. The record reflects that the plaintiff had hired a tattoo artist prior to hiring Sapia and that [the plaintiff's owner] interviewed several candidates when he advertised the position of tattoo artist before Sapia began providing tattoo services at the plaintiff's store in 2013. The plain-

tiff's website also advertises tattoo services during all open store hours. Moreover, the plaintiff held itself out to the public as providing tattoo services. The board found that the plaintiff's website and Facebook page advertise the company as 'Vogue Tattoo and Piercings' and describe the plaintiff's store as 'your one stop destination for body jewelry, stainless steel jewelry, as well as piercing and tattoo services.' "

Having rejected the plaintiff's argument that the board improperly had determined that it failed to satisfy part B of the ABC test, the court concluded its analysis by stating: "Because the three parts of the ABC test are conjunctive, the inability of the plaintiff to satisfy any single one of those parts necessarily results in a conclusion that an employer-employee relationship exists for the purposes of the act. Therefore, in the present case, because the plaintiff has failed to satisfy part B of the test, the court deems it unnecessary to consider parts A or C. . . . The board properly concluded that [the] plaintiff failed to prove that Sapia was employed as an independent contractor under the provisions of the [act]." (Citation omitted; footnote omitted.) Accordingly, the court granted the defendant's motion to dismiss the appeal, and this appeal followed.

We now turn to the claim raised on appeal. The plaintiff asserts that the board improperly interpreted and applied part B of the ABC test to the facts of the present case. We disagree.

Previously in this opinion, we set forth the relevant language of the ABC test codified in § 31-222 (a) (1) (B) (ii). As relevant to the present claim, part B defines " '[e]mployment' " in relevant part as any service performed by "any individual who, under either common law rules applicable in determining the employer-employee relationship or under the provisions of this subsection, has the status of an employee. Service performed by an individual shall be deemed to be employment subject to this chapter irrespective of whether the common law relationship of master and servant exists, unless and until it is shown to the satisfaction of the administrator that . . . (II) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed . . . ." General Statutes § 31-222 (a) (1) (B).

The plaintiff argues that the trial court erred in failing to conclude that the board's ultimate determination was unreasonable and illogical in light of the facts of the present case. According to the plaintiff, the board interpreted the phrase "usual course of the business for which the service is performed" in § 31-222 (a) (1) (B) (ii) (II) too broadly, concluding that tattoo services are part of the plaintiff's usual business, and failed to focus its analysis properly on the specific business enterprise

in which the plaintiff was engaged, which it claims is limited to the sale of body jewelry and body piercing services. The plaintiff argues in relevant part: "Sapia is a tattoo artist and is permitted by the plaintiff, pursuant to a written contract, to operate a tattooing artistry business within the leased unit that the plaintiff pays for. The plaintiff and Sapia have not undertaken the same enterprise. The plaintiff is not a direct provider of tattooing services. Sapia has his own separate business for which he determines the scheduling and the prices, and which is not integrated in any way with the plaintiff's body jewelry piercing business. Sapia is not paid by the plaintiff to provide services to the plaintiff. The services are provided by Sapia directly to Sapia's tattoo clients who pay Sapia's remuneration directly to him after he negotiates the price he wants to charge for the service.

"The plaintiff's enterprise and its specific business activities do not include tattooing people. No one else is licensed to do so. The plaintiff has provided a space for a tattoo artist and is remunerated accordingly with a percentage of the artist's sales. . . .

"Sapia performs services for the tattoo customer and deals with the customer directly on all matters of the transaction, especially the pricing and the scheduling of the transaction. None of this involves the plaintiff's customers, [because the services provided by the plaintiff and Sapia] are completely separate and distinct.

"Under the facts of this case, it is undisputed that the plaintiff has a retail jewelry store selling body jewelry and piercing services. It was found that Sapia was given a backroom space to perform his tattoos on persons who liked his 'deviant art' tattoos. Sapia advertises to his own clientele, schedules all his own appointments and also accepts walk-ins from the mall. Sapia provides his own art supplies and owns the software designs and all of his own intellectual property. None of the work product is retained or owned or usable by the plaintiff. The plaintiff is not paying Sapia to appear and sit hourly in the back room. It is Sapia [who] makes his own schedules and determines the fees for his own enterprise."

Before we turn to the merits of the plaintiff's claim, we set forth some principles that guide our review. "To the extent that an administrative appeal, pursuant to . . . § 31-249b, concerns findings of fact, a court is limited to a review of the record certified and filed by the board of review. The court must not retry facts [or] hear evidence. . . . If, however, the issue is one of law, the court has the broader responsibility of determining whether the administrative action resulted from an incorrect application of the law to the facts found or could not reasonably or logically have followed from such facts. Although the court may not substitute its own conclusions for those of the administrative board,

it retains the ultimate obligation to determine whether the administrative action was unreasonable, arbitrary, illegal or an abuse of discretion." (Internal quotation marks omitted.) *Mattatuck Museum-Mattatuck Historical Society* v. *Administrator, Unemployment Compensation Act*, 238 Conn. 273, 276, 679 A.2d 347 (1996) (*Mattatuck*).

Separate from the plaintiff's argument that the board misapplied the law to the facts found, the issue of whether the board properly interpreted § 31-222 (a) (B) (ii) (II) presents this court with a question of law that is subject to plenary review. "Although [o]ur review of an agency's decision on questions of law is limited by the traditional deference that we have accorded to that agency's interpretation of the acts [that] it is charged with enforcing . . . [i]t is well settled . . . that we do not defer to the board's construction of a statute . . . when . . . the [provision] at issue previously ha[s] not been subjected to judicial scrutiny or when the board's interpretation has not been time tested." (Citation omitted; internal quotation marks omitted.) *Kirby of Norwich* v. *Administrator, Unemployment Compensation Act*, 328 Conn. 38, 47, 176 A.3d 1180 (2018).[9]

In interpreting a portion of the ABC test, our Supreme Court explained in relevant part: "[W]hen interpreting provisions of the act, we take as our starting point the fact that the act is remedial and, consequently, should be liberally construed in favor of its beneficiaries. . . . Indeed, the legislature underscored its intent by expressly mandating that the act shall be construed, interpreted and administered in such manner as to presume coverage, eligibility and nondisqualification in doubtful cases. General Statutes § 31-274 (c). . . . We also note that exemptions to statutes are to be strictly construed. . . . Nevertheless, the act should not be construed unrealistically in order to distort its purpose. . . . While it may be difficult for a situation to exist where an employer sustains his burden of proof under the ABC test . . . it is important to consider that [t]he exemption [under the act] becomes meaningless if it does not exempt anything from the statutory provisions . . . where the law and the facts merit the exemption in a given case. . . . Rather, statutes are to be construed so that they carry out the intent of the legislature. . . . We must construe the act as we find it . . . ." (Citations omitted; internal quotation marks omitted.) *Standard Oil of Connecticut, Inc.* v. *Administrator, Unemployment Compensation Act*, 320 Conn. 611, 616–17, 134 A.3d 581 (2016).

The portion of part B at issue in this appeal, which focuses on whether the service performed is within the usual course of the business of the employer, was interpreted by our Supreme Court in *Mattatuck*, supra, 238 Conn. 273. Thus, we rely on that prior judicial interpretation of the statutory provision at issue. In *Matta-*

*tuck*, our Supreme Court discussed the "usual course of the business" element of part B, stating: "First, it must be determined for whose 'business' the service was performed . . . . [T]he plain language of prong B . . . requires inquiry into '*the* business for which the service is performed . . . .' " (Citation omitted; emphasis in original.) Id., 279; see General Statutes § 31-222 (a) (1) (B) (ii) (II). "Prong B does not refer to the type of business, but, rather, to the specific business activities engaged in by the enterprise. Accordingly, with respect to this prong, we examine the particular activities engaged in by the plaintiff.

"We next define the term 'usual.' The plaintiff argues that 'usual' does not mean 'if you do it, it is within your usual course of business.' We agree. To define the term in such a manner would include every relationship, including bona fide independent contractors, within the purview of the act. Indeed, the administrator does not argue for such a definition. Rather, the administrator asserts, and we agree, that 'usual,' in accordance with its common usage, simply means that an activity is performed by the enterprise on a regular or continuous basis. In the terms of § 31-222 (a) (1) (B) (ii) (II), if the activity is not performed on a regular or continuous basis, then the employer has satisfied prong B because the activity is 'outside the usual course of the business' of the enterprise. . . .

"Prong B . . . does not compel an inquiry into the substantiality or extent of a particular business activity in relation to other activities conducted by the enterprise. We agree that the mere fact that an enterprise undertakes an activity as an isolated instance does not render that activity within its 'usual course of business.' If, however, an enterprise undertakes an activity, not as an isolated instance but as a regular or continuous practice, the activity will constitute part of the enterprise's usual course of business irrespective of its substantiality in relation to the other activities engaged in by the enterprise.

"In sum, prong B requires the finder of fact to determine whether the activity performed is within the 'usual course of business' of the specific business at issue. In our view, 'usual course of business,' as used in § 31-222 (a) (1) (B) (ii) (II), means that the enterprise performs the activity on a regular or continuous basis, without regard to the substantiality of the activity in relation to the enterprise's other business activities." (Footnotes omitted.) *Mattatuck*, supra, 238 Conn. 279–81. Applying this test, the court concluded that the plaintiff museum, which operated largely as an exhibition hall for historic artifacts and art, was the employer of individuals who provided art courses at the museum, even though such lessons may have been insubstantial as compared to the museum's other activities. Id., 280, 282.

After a careful review of the board's decision, we conclude that the board did not misinterpret the statute. As did the trial court, the board expressly cited to and relied on our Supreme Court's binding interpretation of part B of the ABC test as set forth in *Mattatuck*. Furthermore, we agree with the trial court that the board's application of the statute to the facts of the present case, and its determination that the offering of tattoo services was within the plaintiff's usual course of business, was neither unreasonable nor arbitrary.

In determining whether the board's decision logically followed from the facts found, we observe that the board adopted finding ten made by the appeals referee, which directly shed light on the nature of the plaintiff's business enterprise. The finding provides: "[The plaintiff] is in the business of providing piercings, selling jewelry for the piercing, and offering tattoo services. [The plaintiff] advertises through its website and its Facebook page that a customer can have piercings or tattoos done at its store and lists the hours that the tattoo artist is in the store." We observe that the plaintiff does not dispute that this finding was based on the evidence in the record concerning the contents of its website and its Facebook page.[10] This evidence reflects that the plaintiff portrayed itself to the general public as a seller of body jewelry, piercing services, *and* tattoo services. Moreover, this evidence reflects that tattoo services were offered for sale during the hours in which the plaintiff's store was open for business. As the board found, Sapia earned income by means of providing tattoo services in the plaintiff's store and, in fact, his only income was derived from the moneys that he received from the plaintiff for performing tattoo services in its store.

The plaintiff attempts to discount the probative value of its online advertisements. Yet, as our Supreme Court observed in *Mattatuck*, the manner in which a business portrays its business activities to the public, rather than an evaluation of the type of business that it is, is integral to an analysis under part B of the ABC test. *Mattatuck*, supra, 238 Conn. 282 (finding that museum held itself out to public as offering art courses, produced brochures concerning art courses, distributed brochures announcing art courses, and listed art course instructor as member of its faculty, which supported conclusion that art courses were regular part of museum's business enterprise). Thus, there was a basis in the board's findings to support its ultimate determination that the tattoo services provided by Sapia were integral to the activities undertaken by the plaintiff's business enterprise and part of its usual course of business.

The plaintiff argues that, with respect to their analyses under part B, both the board and the court focused solely on the finding concerning the plaintiff's website and Facebook page and not on other relevant findings

that did not support the board's determination.[11] However, nothing in the decisions of the board or the court supports the assertion that *any* relevant findings were ignored because both the board and the court indicated that their decisions were made following a review of the entire record and reflected a review of the entire record. The plaintiff interprets the board's findings and the evidence to support a determination that Sapia's business enterprise was separate and distinct from that of the plaintiff. Even if some of the board's findings, viewed in artificial isolation, could be interpreted as the plaintiff suggests, it does not detract from the reasonableness of the board's conclusion, which was made in consideration of all of its findings. "[R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts." (Citation omitted; internal quotation marks omitted.) *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, supra, 265 Conn. 417–18.

Furthermore, several other findings of fact made by the board, particularly with respect to the work environment that the plaintiff provided Sapia, support the board's conclusion that providing tattoo services was an ongoing and integral part of the plaintiff's business activities. Specifically, the board found that the plaintiff provided Sapia with a workspace in the back room of its store at no cost to Sapia, the plaintiff required tattoo customers to sign a waiver releasing the plaintiff and Sapia from various types of liability, the plaintiff permitted Sapia to use its credit card machine to collect payments from tattoo customers at no cost to Sapia, and tattoo customers received a receipt, which listed the plaintiff's name and contact information. These subordinate findings strongly supported the board's ultimate finding that Sapia's services were a regular part of the plaintiff's business enterprise.

We also reject the plaintiff's argument that the board's findings reflected that Sapia's services merely enhanced the jewelry and body piercing services that it was offering to its own customers purchasing jewelry and piercing services. We agree with the court that the aforementioned findings of the board reflect that the services provided by Sapia were an integral part of the plaintiff's ongoing business activities and that tattoo customers

were part of the plaintiff's customer base. Although the plaintiff argues that its customers and Sapia's customers are "completely separate and distinct," the manner in which the plaintiff advertised its business to the public strongly supports the board's finding that Sapia regularly performed a part of the plaintiff's business enterprise, which was the sale of jewelry, piercing services, *and* tattoo services. We fail to see how Sapia's tattoo services were any less integral to the plaintiff's business than were the art courses at issue in *Mattatuck*.

On the basis of the foregoing, we conclude that the court and the board properly applied part B of the ABC test to the plaintiff's employment relationship with Sapia, and properly concluded that substantial evidence exists in the record for the board to have determined that the provision of tattoo services was within the plaintiff's usual course of business.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The record reflects that the plaintiff is Immortal Studios, LLC, doing business as Vogue. Despite the fact that the plaintiff's appeal to the trial court was docketed under the plaintiff's business name only, a review of the record reflects that it brought its appeal to the trial court as Immortal Studios, LLC, doing business as Vogue. A review of its filings before this court reflects that the plaintiff has brought the present appeal in that same capacity.

[2] In this appeal, the plaintiff also claims that the trial court improperly refused to correct several findings made by the board. We dispose of this claim with little discussion. The plaintiff filed a motion to correct the board's findings. The board granted, in part, and denied, in part, the motion to correct. The court carefully considered and rejected the plaintiff's claim that several findings should be corrected. Having considered the arguments made by the plaintiff, the findings at issue, and the record, we are not persuaded that any error exists with respect to the court's rejection of the plaintiff's claims regarding the findings made by the board. We conclude that the findings challenged in this appeal are either immaterial to an analysis under part B of the ABC test, on which the court relied, or that the plaintiff has not demonstrated that the findings should be corrected pursuant to the standard set forth in Practice Book § 22-9 (b).

[3] As we will explain in greater detail, because the court concluded that the plaintiff failed to satisfy part B of the test, and all three parts of the test must be satisfied to demonstrate that service does not constitute employment under the act, the court did not address parts A and C of the ABC test. In light of our conclusion that the court properly upheld the board's analysis under part B, we likewise need not address parts A and C of the test.

[4] General Statutes § 31-249b provides in relevant part: "At any time before the board's decision has become final, any party, including the administrator, may appeal such decision, including any claim that the decision violates statutory or constitutional provisions, to the superior court for the judicial district of Hartford or for the judicial district wherein the appellant resides. Any or all parties similarly situated may join in one appeal. . . . An appeal may be taken from the decision of the Superior Court to the Appellate Court in the same manner as is provided in section 51-197b. . . ."

[5] Practice Book § 22-4 provides: "If the appellant desires to have the finding of the board corrected, he or she must, within two weeks after the record has been filed in the Superior Court, unless the time is extended for cause by the board, file with the board a motion for the correction of the finding and with it such portions of the evidence as he or she deems relevant and material to the corrections asked for, certified by the stenographer who took it; but if the appellant claims that substantially all the evidence is relevant and material to the corrections sought, he or she may file all of it, so certified, indicating in the motion so far as possible the portion applicable to each correction sought. The board shall forthwith upon the filing of the motion and of the transcript of the evidence, give notice to the adverse

party or parties."

[6] We note that the board denied seven of the plaintiff's requests to correct its findings. Specifically, the board denied the plaintiff's request that finding fourteen state: "Sapia sold tattoo-style artwork to customers for which the [plaintiff] had no rights to any income, and sold his tattoo art, tattoos and designs to the general public at his studio and on websites, such as Etsy." The board denied the request to modify finding twelve to reflect that Sapia advertised his own services by means of distributing personal business cards. The board denied the plaintiff's request that finding ten reflect "that the [plaintiff] lists the hours that the tattoo artist is in the store and to call for availability." The plaintiff also asked the board "to add language reflecting that Sapia was not required to be in the [plaintiff's] store for any set times and that he was under his own incentive as to whether or not he was in the store on any given day." The board denied the request that it delete a reference in its decision to the fact that "Sapia would only be available certain hours during the [plaintiff's] hours of operation . . . ." The board denied the request that it delete the following finding from its decision: "[T]he [plaintiff] provided no evidence that Sapia actually performed tattoo services under his own name or has a regular or established clientele." The board denied the plaintiff's request that it adopt a finding that Sapia set his own prices. Finally, the board denied the plaintiff's request that it find as follows: "Sapia has liability to Vogue to correct defective work, and for a proper accounting of commissions paid and [owed], and for client refunds."

[7] Specifically, in May, 2018, the plaintiff, pursuant to Practice Book § 22-8, filed claims of error with respect to portions of the board's decision on the motion to correct. See footnote 2 of this opinion.

[8] The court also stated: "Even if the plaintiff were to argue that Sapia performed his services outside of the plaintiff's place of business, the record reflects that Sapia provided his tattoo services at the plaintiff's store and, thus, not outside the plaintiff's place of business."

[9] The defendant asserts that this court should defer to the board's reasonable findings but does not assert that the board's interpretation of § 31-222 (a) (1) (B) (ii) (II), as applied to the unique fact pattern presented by the present case, is time-tested or that its interpretation previously has been subjected to judicial scrutiny. The plaintiff asserts that part B of the ABC test has not been subjected to significant judicial or agency interpretation.

[10] The evidence, which was credited by the board, reflects that the plaintiff, by means of its website and Facebook page, described its business as "Vogue Tattoo and Piercing." The plaintiff's website introduced potential customers to the services it provides, in relevant part: "Welcome to Vogue, your one stop destination for body jewelry, stainless steel jewelry, as well as piercing and tattoo services." One portion of the plaintiff's website stated: "Tattoo Artist available daily from noon to 8 p.m., except Sundays." Another portion of the website stated: "Tattoo Artist Mark Sapia. Available for walk-ins daily except for Sundays. Call for availability . . . ." The phone number listed on the website was for the plaintiff's business.

[11] Although, in connection with this claim, the plaintiff relies on facts that were not found by the board, we will confine our analysis to the findings of the board.